IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

GLADYS LOUISE SEABROOKS,
     Plaintiff,

vs.                                 Case No.: 5:13cv89/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 17, 18).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner is affirmed.

I.     PROCEDURAL HISTORY

On August 17, 2009, Plaintiff filed an application for SSI and alleged therein disability beginning January 16, 2003 (tr. 21).[1]  Her application was denied initially and on reconsideration, after which she requested a hearing before an administrative law judge ("ALJ").  A hearing was held

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on July 19, 2013 (doc. 13).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that might appear.

on August 26, 2011,[2] and on November 21, 2011, the ALJ issued a decision in which she found Plaintiff "not disabled," as defined under the Act, at any time through the date of her decision (tr. 21–35). The Appeals Council subsequently denied Plaintiff's request for review, after considering additional evidence submitted by her counsel (*see* tr. 1–5; *see also* tr. 253–56, 363–67). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. *See* Poellnitz v. Astrue, 349 F. App'x 500, 501 (11th Cir. 2009) (unpublished) ("When the ALJ denies benefits and the [Appeals Council] denies review, we generally review the ALJ's decision as the Commissioner's final decision."); *see also* Ingram v. Comm'r of Soc. Sec., 496 F.3d 1253, 1262 (11th Cir. 2007) ("a reviewing court must consider whether that new evidence [submitted to the Appeals Council] renders the denial of benefits erroneous"). This appeal followed.

II.   FINDINGS OF THE ALJ

In denying Plaintiff's claim for SSI, the ALJ made the following relevant findings (*see* tr. 21–35):

(a)   Plaintiff did not engage in substantial gainful activity after August 17, 2009, the date she applied for SSI[3];

(b)   During the relevant period Plaintiff had three severe impairments—borderline intellectual functioning, right hand deformity status post gunshot wound, and drug and alcohol abuse—but she had no impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(c)   Plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. § 416.967(b),[4] with certain additional mental and physical restrictions;

---

[2] During her hearing before the ALJ, Plaintiff amended her alleged onset date from January 16, 2003, to August 17, 2009, to coincide with the date she applied for SSI (*see* tr. 55–56).

[3] The time frame relevant to Plaintiff's claim for SSI is August 17, 2009 (date of application (and, in this case, date of alleged onset/amended onset)), through November 21, 2011 (date of ALJ's decision). *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

[4] Light work is defined in 20 C.F.R. § 416.967(b) as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(d)      Plaintiff was born on September 15, 1961, and thus was forty-seven years of age (a "younger person") on the date she applied for SSI, though she subsequently became a person "closely approaching advanced age" during the relevant period (*see* 20 C.F.R. § 416.963, describing these age categories and corresponding age ranges (i.e., under 50, and between 50 and 54, respectively));

(e)      Plaintiff, who has no past relevant work, has at least a high school education and is able to communicate in English;

(f)      Considering Plaintiff's age, education, and RFC, there were jobs available in the national economy that she could have performed during the relevant period, and thus she was not disabled at that time.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).   "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).  Pursuant to 20 C.F.R. § 404.1520(a)–(g),[5] the Commissioner analyzes a disability claim in five steps:

    1.     If the claimant is performing substantial gainful activity, she is not disabled.

    2.     If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

    3.     If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

    4.     If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

    5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

---

[5] In general, the legal standards applied are the same regardless of whether a claimant seeks disability insurance benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404 (DIB), 416 (SSI)).  Therefore, citations in this Order should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

A.   Personal History, Including Reports and Statements Regarding Plaintiff's Abilities

Plaintiff testified at her hearing before the ALJ that she was in special education classes when she was in school, but she completed the twelfth grade, obtained a "regular"—as opposed to a "special"—diploma, and is able to read and write (tr. 51–52; *see also* tr. 178, 183).  Her right hand is deformed to the extent four of her fingers are curled up, involuntarily, as a result of a gunshot wound to the head Plaintiff sustained at the age of ten or eleven (*see* tr. 51, 272, 274, 334, 365).  Plaintiff also has a congenital defect to left elbow, though Plaintiff—who is left-handed—noted that her "significant" injuries are the ones to her right hand, not her left arm (tr. 51, 335).

Plaintiff testified she previously received specialized training for motel/hotel housekeeping and "helping [] handicapped kids," and had worked (and apparently was working at the time of her hearing before the ALJ) about one day per week cleaning houses (tr. 56–58).[6]  She testified she was incarcerated for eighteen months and released in or about January 2003 (tr. 52).  Though it is not entirely clear from her testimony, Plaintiff appears to have stated that she was incarcerated again in or about 2008, and released in August 2009,[7] just before she submitted the SSI application at issue in this appeal (*see* tr. 53–54).[8]

Plaintiff testified she could not work full time due to transportation problems (tr. 58).  She also discussed some problems with her left elbow, including that it occasionally swells and becomes painful when, for example, the weather changes, though applying heat or using Advil and Tylenol eases the pain (tr. 59–60).  With respect to her right upper extremity, in addition to having permanently bent fingers due to ligament damage, Plaintiff also gets "charley horses" in her hand and knots in her arm (tr. 61).  She can relieve the charley horses and knots by rubbing her hand and arm (*id.*).  She

---

[6] Earnings records reflect no reported income between 1992 and 2011, other than income in the amount of $81.00 in 2001 (*see* tr. 160–61).

[7] Records of the Florida Department of Corrections ("FDOC"), included in Plaintiff's claims file, substantiate and clarify Plaintiff's testimony.  They reflect that she was incarcerated, and released, in 1998, after being convicted of two counts of possession of cocaine; incarcerated in 2001, and released in 2003, after being convicted of sale, manufacture, or delivery of cocaine; and incarcerated on September 16, 2008, and released on August 12, 2009 (five days before she submitted the SSI application at issue here), after being convicted of sale, manufacture, or delivery of cocaine (tr. 166).  Thus, she evidently has previously been convicted of at least four felony offenses.

[8] It is evident from Plaintiff's testimony, and the questions posed to her by her attorney, that she received SSI prior to her most recent incarceration (*see, e.g.*, tr. 46, 73).  She testified, however, that she is "better" now than when she previously received SSI (tr. 73).

estimated she could lift no more than five pounds, but she is able to reach and grab items with both hands, though she has some trouble doing so with her right upper extremity, and she can use her left hand to do things such as dial a telephone number (*see* tr. 65–66).  Plaintiff also gets bad headaches, apparently as a result of being shot, and she takes Advil for the headaches (tr. 62).  If she lies down in a quiet place, her headaches resolve in about two to three hours (*id*.).

Plaintiff additionally testified she has asthma, which prevents her from walking more than about three blocks (tr. 63), although she later testified she could "stand up [] and walk around" for "a good two hours or more" before having to sit (tr. 64).  She has an inhaler but normally does not need to use it (tr. 63).  Her asthmatic condition worsens in damp environments or with exposure to chemicals or cleaners, although a mask helps with respect to the chemicals and cleaners (tr. 63–64). Plaintiff is able to walk up steps, bend, and balance (*see* tr. 66).  She can read and understand newspaper articles and follow the news on television, as well as care for herself, cook, shop, and perform household chores, including doing laundry and washing dishes (tr. 66–68).  Finally, Plaintiff admitted to smoking a marijuana joint "every now and then" and stated she last used crack cocaine in 2010 or 2011 (tr. 69, 74).

On August 17, 2009, the day Plaintiff applied for SSI, she was interviewed by a representative of the Commissioner, who observed that Plaintiff's fingers were "drawn up" (tr. 170).  The representative also noted that Plaintiff had no difficulty reading, writing, understanding, concentrating, talking, or answering questions (*id*.).  Plaintiff's daughter provided a similar report on October 16, 2009, and indicated that Plaintiff had no difficulty completing tasks, following written or spoken instructions, remembering, concentrating, or understanding (tr. 190).  A "Report of Contact" form dated May 13, 2010, reflects Plaintiff's report that she had received no physical health care for "more than a year," because she had no insurance, and no mental health care since (approximately) 2007 (tr. 210).  She also reported taking no medications (*id*.).  She stated she could perform household chores, lift up to thirty pounds with her left hand, cook, "go around place[s]," and independently care for her personal and hygiene needs (*id*.).  Another contact form, dated June 24, 2010, reflects Plaintiff's report that she can button and unbutton a shirt with both hands, zipper pants with both hands, fold clothes with both hands, lift up to thirty pounds with her dominant left hand and twenty pounds with her right hand, and write and pick up coins with her left hand (tr. 221).

B.    Evidence Related to Plaintiff's Borderline Intellectual Functioning ("BIF")

Plaintiff was apparently administered the Stanford-Binet Intelligence Scale and the Peabody Picture Vocabulary Test in January 1969 at age seven (doc. 19 at 4 (citing tr. 245)).  Plaintiff states that these tests "indicated IQ scores of 50–60 and 62–72, respectively" (*id.*).[9]  In November 1969, at age eight, Plaintiff was administered the Wechsler Intelligence Scale for Children ("WISC") by examiner Gordon Jackson.  Mr. Jackson assessed a Verbal IQ of 63, Performance IQ of 57, and Full Scale IQ of 56, placing Plaintiff within the "Defective Range of ability" and rendering her eligible for placement in "special classes" subject to departmental approval (tr. 246).  Mr. Gordon noted, however, that although Plaintiff had trouble understanding his instructions, he was not sure whether this was a true deficit in understanding or whether it was attributable to her "indulging heavy [sic] in the vernacular" (*id.*).  Regardless of the cause, in light of the problem Mr. Gordon pro-rated the examination on the basis of eight sub-tests "rather than the usual [ten] sub-tests" (*id.*).  Nevertheless, he stated that the "test results are considered to be a fair indication of [Plaintiff's] present mental functioning" (*id.*).  In April 1972, when Plaintiff was ten years of age, psychometrist Diana Richards administered an abbreviated WISC (as did Mr. Gordon), which resulted in the following IQ scores: 82, Non-Verbal IQ; 66, Verbal; and 71, Full Scale (tr. 243).  Ms. Richards noted that Plaintiff's non-verbal potential had "developed quite significantly" and that her verbal potential had stabilized (*id.*).  She opined that Plaintiff was approximately three years behind other children with respect to mental maturity, and thus that she should continue in special education classes (tr. 243–44).

In the sixth, seventh, and eighth grades, or from approximately 1973 through 1975, Plaintiff made As, Bs, and Cs and was promoted each year, although she was designated "EMH," which indicates educable mentally handicapped (*see* tr. 230).  In February 1975, at age thirteen, Plaintiff was administered the WISC by psychologist Carol Gray.  Testing indicated a Full Scale IQ of 58, Verbal IQ of 60, and Performance IQ of 63 (tr. 241).  Dr. Gray opined that Plaintiff appeared to be performing at or near the 1969 level, although she commented that neither the 1969 IQ scores nor the 1972 IQ scores "resulted from a complete test battery" (*id.*).  She recommended that Plaintiff continue in EMH classes and submit to retesting in three years, as well as engage in "home training" (*id.*).  She made no other recommendations (*id.*).

---

[9] The undersigned cannot decipher the record on which Plaintiff relies, as it is very dark, has evidently been photocopied numerous times, and is largely illegible.  That said, the record does appear to reflect the IQ scores cited by Plaintiff, but the narrative portion of the record is wholly illegible (*see* tr. 245).

Plaintiff attended high school for four years (comprising eight semesters, between 1976 and 1980), and she graduated in May 1980 (tr. 229).[10]  She primarily made Bs and Cs, although on occasion she made higher or lower grades (*see id.*).

In March 1977, psychologist John W. Keller administered the Wechsler Intelligence Scale for Children Revised ("WISC-R") to Plaintiff, who was then fifteen years of age (tr. 242).  Dr. Keller reported a Full Scale IQ of 69, a Verbal IQ of 65, and a Performance IQ of 75 (*id.*).

Approximately one year prior to Plaintiff's graduation from high school, she was referred to the Haney Vocational Technical Center for a determination as to her readiness for vocational training or placement (tr. 232).  The evaluator, Marty Ruddon, MRC, CRC, noted that Plaintiff previously worked as a teacher's aide at a center for mentally retarded citizens and received shop and home economics training (*id.*).  Following a one-week evaluation and observation period, Ms. Ruddon noted that Plaintiff's overall assets included an ability to perform "routine assembly skills using her hands and hand tools," a willingness to perform repetitive work, and an ability to work quietly (tr. 234).  Ms. Ruddon stated that it was difficult to determine during the one-week evaluation how many steps Plaintiff could understand and complete on a task, but she found that Plaintiff could likely perform up to three-step tasks "well" if they were demonstrated to her and were concrete in nature (tr. 233).  Ms. Ruddon further opined that Plaintiff needed supervised work experience, as her abilities fell "somewhere between sheltered workshop and employment" (tr. 234).  She suggested possible work experience placements for Plaintiff, noted that Plaintiff would learn best by observing a demonstration, and reiterated that Plaintiff would likely perform best in jobs involving servicing or the use of tools (tr. 233–34).  Ms. Ruddon summarized her opinions as follows: "[B]ecause of [Plaintiff's] somewhat limited capacity to learn tasks and to perform them in a competitive way her employment options are not strong.  She falls in a difficult area between sheltered workshop for protective employment and standard employment." (tr. 234).

On September 23, 2008, at age forty-seven, Plaintiff underwent an intake psychological screening/examination within a week of her most recent receipt into the custody of the FDOC (tr. 309).  Plaintiff advised the examiner, Jeffrey Tripp, that she first began using crack cocaine on a daily basis at age twenty-one, and she expressed "mild hopelessness" (tr. 308).  Additionally, BETA III

---

[10] Although Plaintiff's eighth grade record states, "promoted to 9th [grade] EMH" (tr. 230), her high school transcripts do not indicate that she was in special education classes in high school (tr. 229).

intelligence testing resulted in an IQ score of 76, which placed Plaintiff in the "borderline range of measured intelligence" (*id*.).

In December 2009, Robert F. Schilling, Ph.D., a non-examining agency psychologist, was provided a Psychiatric Review Technique ("PRT") form and asked to assess Plaintiff's mental impairment(s) (*see* tr. 312–25).  He declined to do so due to "[i]nsufficient [e]vidence" in the record (tr. 312).  More specifically, he noted that although Plaintiff's SSI claim was based in part on an alleged mental disability, in her application she listed no treatment for a mental illness, and the medical evidence of record included no mental diagnosis or mental health treatment records (tr. 324).

On May 13, 2010, Plaintiff was evaluated by psychologist Julian Salinas, Ph.D., at the Commissioner's request (tr. 328).  Dr. Salinas conducted a clinical interview and reviewed Plaintiff's FDOC records (*id*.).  Plaintiff told Dr. Salinas she was shot in the head in 1972 and sustained a skull fracture but no brain injury (tr. 329).  The shot, however, reportedly caused lifelong problems with Plaintiff's right hand, which problems—as previously noted—are in addition to some left arm problems attributable to a congenital deformity (*id*.; *see also* tr. 355).  Plaintiff also reported previous work experience as a housekeeper, assistant for the handicapped, and salad prep worker (tr. 329).  She stated she last worked in 1998 and stopped working because she "couldn't do it" due to her arms giving out (*id*.).  Plaintiff advised that she started drinking alcohol at age eleven and that her maximum use occurred during her thirties and forties, when she was drinking five quarts of malt liquor per day (*id*.).  She reported occasional use of marijuana and, as before, admitted to previously using cocaine on a daily basis (*id*.) and stated she used cocaine daily between the ages of twenty-two and forty (*id*.).  She also told Dr. Salinas that she smoked crack cocaine approximately three weeks prior to her appointment with him (*id*.).  Finally, Plaintiff advised that she never obtained substance abuse treatment or psychological treatment (*id*.).

Dr. Salinas noted that Plaintiff was oriented to time, place, and circumstances; she spoke logically and coherently; she spoke at an adequate rate and volume; she had some difficulty with speech articulation, but her speech content was consistent with her reported level of education and low intellectual functioning; and she provided relevant answers to questions, though at times her answers were "poorly elaborated" (tr. 330).  Plaintiff reported problems with concentration, memory, and mood (*id*.).  Dr. Salinas assessed alcohol abuse, cocaine dependance, a provisional diagnosis of

mild mental retardation, and a Global Assessment of Functioning score of 52[11] (*id*.). He opined that Plaintiff was incapable of managing her own funds "given her difficulty with numerical computation and her potential intellectual deficits" (*id*.). Additionally, although Dr. Salinas did not believe emotional difficulties were a clinical concern, he recommended—based on Plaintiff's exhibiting "deficits indicative of low intellectual functioning during the clinical interview"—a follow-up intellectual assessment (tr. 331).

In June 2010, Martha Putney, Ph.D., a non-examining agency psychologist, completed a PRT form (tr. 341–54). In relevant part, she considered Plaintiff's substance addiction disorders under section (or "Listing") 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (*see* tr. 341, 349). Dr. Putney noted that Plaintiff had exhibited "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system," as described in the introductory paragraph of Listing 12.09, and thus she considered Plaintiff's condition under Listing 12.02, the listing for organic mental disorders (*see* tr. 341, 342, 349).[12] Then, with respect to the criteria of Listing 12.02, Dr. Putney found that although Plaintiff had a history of "SLD [slow learning disability]/context misbehavior" and had previously been assessed with BIF, she had no psychological or behavioral abnormalities that would satisfy the criteria of the listing (*see* tr. 342). She also had no more than "moderate" functional limitations (tr. 351; *see also* tr. 337–38).

On January 20, 2012, or approximately two months after the ALJ issued her decision, Plaintiff was evaluated by David Smith, Ph.D., of the Life Management Center, upon referral by her attorney (*see* tr. 364), and her attorney subsequently submitted Dr. Smith's report to the Appeals Council in connection with Plaintiff's request for review. Dr. Smith reported that Plaintiff was oriented in all

---

[11] Global assessment of functioning, or "GAF," is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994) ("DSM-IV"). It may be expressed as a numerical score. *Id.* at 32. A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

[12] The PRT form—consistent with the terms of Listing 12.09—directs that if a claimant has experienced the requisite behavioral or physical changes associated with the use of substances described in the introductory section of Listing 12.09, the evaluator should then consider the claimant's condition under one or more of the following, most closely applicable, Listings: 12.02, 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.08 (personality disorders), 11.14 (peripheral neuropathies), 5.05 (liver damage), 5.04 (gastritis), 5.08 (pancreatitis) or 11.02/11.03 (seizures) (*see* tr. 349). Here, Dr. Putney concluded that Listing 12.02 was the most closely applicable listing.

spheres, her thinking was organized, and she evidenced no signs of hallucinations, delusions, or other psychotic symptoms (*id*.).  He noted several "indicators of intellectual deficits," including Plaintiff's history of special education and limited verbal skills (*id*.).  Plaintiff told Dr. Smith that she was forgetful, confused, and had difficulty concentrating (*id*.).  For example, she stated, she will "walk off[] and leave[] the skillet on," and thus she does not cook without supervision (tr. 365).  She also stated she had previously worked as a maid and "emphasized that her physical limitations [i.e., problems with her hands] are her primary work impediments," though she also "provided numerous examples of work-related handicaps due to cognitive [and/or memory] deficits" (*see* tr. 365–66).  She admitted to prior use of crack cocaine but added that she had been "clean" for four years (tr. 364, 366).

Dr. Smith administered the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), which resulted in a Verbal Comprehension IQ of 66, a Perceptual Reasoning IQ of 67, a Working Memory IQ of 58, a Processing Speed IQ of 71, and a Full Scale IQ of 59, all of which scores he deemed to be valid.  He assessed depressive disorder NOS and mild mental retardation (tr. 365–66).

C.      Evidence Related to Plaintiff's Physical Conditions

On one occasion in 2006 and one occasion in 2007, Plaintiff presented to Misal Khan, M.D., with hypertension-related complaints (tr. 258) and complaints of leg pain (tr. 259).  Other medical records in the file concern treatment Plaintiff received on approximately six different occasions in 1995, 1996, and 1997 (*see* tr. 260–65), long before the time frame relevant to this appeal.  These records are handwritten and partially illegible.  The legible portions reveal that Plaintiff complained of vision problems, headaches, some numbness in her hands, and right arm pain (*id*.).

On September 24, 2008, Plaintiff underwent a physical examination shortly after her most recent admission to the FDOC (tr. 273).  The examiner noted Plaintiff's right hand deformity, which was described as a flexion contracture of the right first through fourth fingers, as well as an incomplete extension of the left elbow and forearm rotation deficit due to a congenital defect (tr. 274).  In all other respects Plaintiff's examination was essentially normal (*see* tr. 273–74), and Plaintiff was cleared for work release (tr. 275).  Monthly FDOC nursing assessments from October 2008 through February 2009 reflect that Plaintiff occasionally reported headaches but never reported joint pain or numbness/tingling in the extremities (tr. 271).

On May 23, 2010, Plaintiff was examined by internist Ronald Jacobs, M.D., at the Commissioner's request (tr. 333–36).  Plaintiff reported she could walk two miles, lift five pounds, shop, climb stairs, sweep, vacuum, cook, and do the dishes but could not mop or stand more than ten minutes (tr. 333).  Dr. Jacobs noted Plaintiff's second through fifth right fingers were "bent and contracted in a fully flexed manner and could only be opened with forced passive movement" (tr. 334).  Additionally, he stated that Plaintiff's left arm had 15 degrees of flexion at the elbow, but she could not pronate the left arm (tr. 335).  No other abnormalities or limitations were noted.  Dr. Jacobs completed a "Range of Motion [ROM] Report Form" and noted that Plaintiff had full ROM in twenty-four of the twenty-seven areas tested, including all (three) areas of the right elbow and all (two) areas of both the right and left wrist (tr. 336).  He found limited ROM in three areas of the left elbow: (1) flexion, or bending the arm at the elbow upward toward the shoulder (which was limited to 100 degrees out of a possible full ROM of 150 degrees ("100/150")); (2) pronation, or rotating the straight arm inward toward the body (10/80); and supination, or rotating the straight arm outward away from the body (40/80) (*id*.).  Dr. Jacobs also reported that Plaintiff's grip strength was full, at "5/5," in both hands (tr. 335).  In conclusion he stated, Plaintiff's "problems are the left arm and the right hand . . . [ROM] is limited mainly to the elbow of the left arm only"; and, that her "limitations are the left arm and right hand, which I do not know what could be done about that, but that would limit her employment possibilities at this time" (*id*.).

Finally, on June 24, 2010, Olga M. Garcia, M.D., a non-examining agency physician, opined that Plaintiff can occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk, or sit about six hours in an eight-hour workday (tr. 356).  Further, Plaintiff has the unlimited ability, subject to the foregoing restrictions, to push or pull (*id*.).  Dr. Garcia assessed no limitations with regard to reaching and feeling but concluded that Plaintiff could not perform gross manipulation ("handling") or fine manipulation ("fingering") with either hand for more than two-thirds of the workday (tr. 357–58).  Lastly, she assessed only one environmental limitation, namely, that Plaintiff avoid moderate exposure to hazards such as machinery or heights (tr. 359).

D.    Testimony of the Vocational Expert ("VE")

John Black, a VE, testified at Plaintiff's hearing held August 26, 2011.  In summary, he testified that a hypothetical person with Plaintiff's RFC, who has no past relevant work, could perform

available jobs such as bill sorter, dial marker, and ticket seller, and that these jobs are performed at the light or sedentary level of exertion (*see* tr. 80–81).   Mr. Black noted that the bill sorter job involves nearly constant reaching, the dial marker job involves frequent to constant reaching, and the ticket seller job requires "closer to occasional" reaching (tr. 82).   With respect to the latter job, Mr. Black explained that oftentimes a ticket seller is idle but at other times could be frequently reaching when sales are at a "rush hour" pace, so in general he found that "occasional" best described the reaching demands of the job (*see* tr. 82–83).   Finally, Mr. Black testified that the dial marker and ticket seller jobs could be done by using only one hand, but the bill sorter job required the use of both hands (tr. 83).

V.      DISCUSSION

Plaintiff generally contends the ALJ erred by failing to properly analyze her mental impairments, failing to properly account for or include left upper extremity limitations in the RFC, and improperly discounting her subjective complaints of pain and other limitations.   She additionally asserts various sub-claims that will be considered in conjunction with the related general claims.

A.      Mental Impairments

Plaintiff contends that her intellectual disability meets the criteria of 20 C.F.R. Pt. 404, App. 1, § 12.05(B) and/or (C), and that the ALJ erred in concluding otherwise.   Plaintiff also contends the ALJ erred in failing to further develop the record by referring her for IQ testing.   Finally, Plaintiff contends the Appeals Council erred in denying review in light of Dr. Smith's findings.

Listing 12.05 contains an introductory paragraph with the diagnostic description for intellectual disability, namely: 1) significantly sub-average general intellectual functioning; 2) deficits in adaptive functioning; and 3) onset before age twenty-two.   The listing also contains four sets of criteria (paragraphs A through D).   With respect to paragraph B, a claimant must meet the criteria of the introductory paragraph and have a "valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. Pt. 404, App. 1, § 12.05(B).   Paragraph C requires, in addition to the criteria of the introductory paragraph: 1) "a valid verbal, performance, or full scale IQ of 60 through 70"; and 2) "a physical or other mental impairment imposing an additional and significant work-related limitation or function."   *Id.*, § 12.05(C).   If a claimant's impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, the impairment meets the listing.

(1)      Listing 12.05(B) — Findings of the ALJ

As previously noted, to meet this listing Plaintiff—in relevant part—must have a valid verbal, performance, or full scale IQ of 59 or less.  Plaintiff contends the ALJ erred in finding that she does not meet this listing because she was assessed with several IQ scores below 60, and in support she points to IQ scores that were assessed in 1969, at ages seven and eight, and in 1975, at age thirteen.

Plaintiff's argument is easily disposed of, as the IQ scores assessed during Plaintiff's childhood do not "provide an accurate assessment of Plaintiff's functional status as an adult," as the ALJ found (tr. 27).  "The structure of the mental disorders listings for children under age 18 parallels the structure for the mental disorders listings for adults . . . [but there] are <u>significant</u> differences between the listings for adults and the listings for children." 20 C.F.R. Pt. 404, App. 1, § 112.00(A) (emphasis added).  Although both sets of listings turn in part on IQ scores, with respect to children's IQ scores the regulations provide:

> IQ test results must also be sufficiently current for accurate assessment under 112.05 [the listing for childhood intellectual disability].  <u>Generally, the results of IQ tests tend to stabilize by the age of 16</u>.  Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior.  IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above.  IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.

20 C.F.R. Pt. 404, App. 1, § 112.00(D)(10) (emphasis added).

The IQ scores on which Plaintiff relies, which were assessed when Plaintiff was seven, eight, and thirteen, were all above 40.  The scores were therefore "current"—or, for purposes of this appeal, "valid"—for only two years, as the ALJ noted (*see* tr. 27).  Thus, the scores identified by Plaintiff do not establish a "valid verbal, performance, or full scale IQ of 59 or less" or otherwise relate to the time frame relevant to this appeal, which is approximately forty years after those scores were assessed.  Stated succinctly, the ALJ did not err in concluding that Plaintiff's "remote IQ scores cannot

be relied upon to satisfy the 'paragraph B' criteria" of Listing 12.05 (tr. 26; *see also* tr. 27 (ALJ's referencing § 112.00(D)(10))).[13]

(2)     Listing 12.05(C) — Findings of the ALJ

Plaintiff also contends the ALJ erred in failing to find that she meets the paragraph C criteria of Listing 12.05.  In support, Plaintiff argues that the evidence before the ALJ establishes that she: (1) meets the criteria of the introductory paragraph of the listing; (2) has a valid verbal, performance, or full scale IQ of 60 through 70; and (3) has a physical or other mental impairment imposing an additional and significant work-related limitation or function.  The court need only discuss the second prong to dispose of this contention.

As previously discussed, none of the IQ scores that were assessed prior to Plaintiff's attaining the age of sixteen are valid indicators of her mental functional status some forty years later during the relevant period.  And the only other IQ score of record before the ALJ was the score of 76 assessed by the FDOC examiner in September 2008.  This assessment was made within a year of the commencement of the relevant period, when Plaintiff was forty-seven years of age.  Thus, the ALJ did not err in concluding that "the 'Paragraph C' criteria of listing 12.05 are not met because [Plaintiff] does not have a valid verbal, performance, or full scale IQ of 60 through 70 . . . ." (tr. 27). Additionally, in light of the foregoing conclusion of the ALJ (and the ALJ's similar conclusion regarding the lack of a valid IQ score to satisfy the paragraph B criteria), the ALJ had no need to determine whether Plaintiff met the other criteria of Listing 12.05, such as those contained in the introductory paragraph, and to the extent Plaintiff claims the ALJ erred by failing to analyze those criteria (*see* doc. 19 at 15–16), the contention is without merit.

(3)     Development of the Record

---

[13] It is of no moment that the ALJ discounted the remote scores for other reasons not discussed herein, even if those reasons are improper, as it is clear that the scores are not valid and thus cannot support a finding that Plaintiff meets the criteria of Listing 12.05.  *See, e.g.*, Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 1981) (reversal and remand based on disregard of a social security ruling may occur only when the plaintiff also shows that prejudice arose from that error); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (the ALJ's decision will stand when an incorrect application of the regulations results in "harmless error," because the correct application would not contradict the ALJ's ultimate findings); Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry involves determining "whether the ALJ would have reached the same decision denying benefits, even if [s]he had followed the proper procedure . . . .").

Plaintiff raises two related contentions here.  First, she faults the ALJ for deeming "valid" the IQ score of 76 assessed by the FDOC examiner in September 2008.  She argues that this score did not result from a thorough psychological examination and that the ALJ should have referred Plaintiff for comprehensive IQ testing instead of relying on it.  Second, she asserts that the ALJ erred by failing to order IQ testing in light of certain evidence in the record, such as her childhood IQ scores and Dr. Salinas' recommendation that she undergo a follow-up intellectual assessment.  These arguments are red herrings and, as explained next, do not persuade the court that the ALJ erred.

### Validity of the FDOC-Assessed IQ Score

Initially, the court is not convinced that the IQ score assessed by the FDOC examiner is invalid, as Plaintiff asserts.  With respect to adult intelligence tests, the regulations recognize that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability [under Listing 12.05(B) or (C)]."  20 C.F.R. Pt. 404, App. 1, § 12.00(D)(6)(b).  They also explain that it is generally:

> preferable to use IQ measures that are wide in scope and include items that test both verbal and performance abilities.  However, in special circumstances, such as the assessment of individuals with sensory, motor, or communication abnormalities, or those whose culture and background are not principally English-speaking, measures such as the Test of Nonverbal Intelligence, Third Edition (TONI-3), Leiter International Performance Scale-Revised (Leiter-R), or Peabody Picture Vocabulary Test-Third Edition (PPVT-III) may be used.

*Id.*, § 12.00(D)(6)(d).  The regulations further explain that the Commissioner:

> may consider exceptions to formal standardized psychological testing when an individual qualified by training and experience to perform such an evaluation is not available, or in cases where appropriate standardized measures for your social, linguistic, and cultural background are not available.  In these cases, the best indicator of severity is often the level of adaptive functioning and how you perform activities of daily living and social functioning.

*Id.*, § 12.00(D)(6)(e).

It is clear, then, that standardized tests such as the Wechsler series are preferred, but it is also clear that exceptions to the general preference exist.  Although the exceptions described in the regulations do not precisely mirror the circumstances under which the FDOC examiner administered the BETA III intelligence test ("BETA test") to Plaintiff, the court is of the view that the BETA test yielded a reliable and valid IQ score under the circumstances at bar.  As set forth in the attached

FDOC "Technical Instruction No. 15.05.17" (*also available at* http://www.dc.state.fl.us/ (search for "technical instruction no. 15.05.17," then click on hyperlink)), which instruction was in effect at the time of Plaintiff's 2008 admission to the FDOC (*see id.*), all FDOC inmates are screened within fourteen days of admission to identify those who suffer from a mental disorder or are mentally retarded. *Id.*; *see also* Thomas v. McNeil, No. 3:04-CV-917-J-32JRK, 2009 WL 64616, at *2 (M.D. Fla. Jan. 9, 2009) *aff'd sub nom.* Thomas v. Bryant, 614 F.3d 1288 (11th Cir. 2010) and *aff'd sub nom.* Thomas v. Bryant, 614 F.3d 1288 (11th Cir. 2010) ("The mental health of all inmates is evaluated upon entry into a [FDOC] correctional institution and at certain other times during an inmate's term of incarceration.").  As part of this screening, an FDOC examiner must conduct a clinical interview to ascertain the inmate's mental health history, substance abuse history, educational background, and employment history (*see* attached instruction).[14]  The examiner must also perform a thorough mental status examination.  *Id.*  In Plaintiff's case, as required by the technical instruction, the examiner evaluated Plaintiff's mental status in twenty-two areas and found that she was "within normal limits" in twenty-one of those areas, including with respect to her behavior, speech, affect, and orientation; in the twenty-second area, "distractibility," he found her to be occasionally distracted (tr. 309).  He elaborated on some of his findings in a narrative section of his report, where he noted that Plaintiff's thought processes were logical and that she displayed no deficits with respect to immediate memory but some as to remote memory (*id.*).  The examiner also, as required by the technical instruction, administered the BETA test, which yielded an IQ score of 76.  He did not administer additional IQ tests, such as the Wechsler Abbreviated Scale of Intelligence, because the instruction provides that no additional testing is required if the BETA test results in an IQ score of 76 or higher (*see* attached instruction).  The examiner ultimately found that Plaintiff had no history of a mental health disorder, her adaptive behavior was within normal limits, she was not mentally retarded or moderately impaired, and she did not need a psychiatric evaluation or further psychological

---

[14] The FDOC's records indicate that the required clinical interview was conducted (*see* tr. 308–09).  The records also reflect inconsistent reports by Plaintiff with respect to her high school education during this interview. At one point she advised the examiner that she was not in special education classes in high school (tr. 308), but at another point she reported being in "SLD classes for grades 10 [through] 12" (tr. 309).

assessment or treatment (tr. 311).[15]  He assigned Plaintiff a psychiatric grade of "S-1," the lowest possible designation.  *Id.*; *see also* <u>Thomas</u>, 2009 WL 64616, at *2 ("The [F]DOC mental health classification system assigns each inmate one of six possible categories, ranging from 'S–1,' the lowest possible designation, reserved for inmates who have no significant impairment and require no mental health services, through 'S–6,' which is the highest possible category reserved for inmates who are acutely and severely mentally ill. . . .  Inmates designated as S–1 or S–2 (those having no more than a mild impairment and needing few or no mental health services), are housed in any of a number of [the FDOC's 60] facilities throughout the state [but inmates with higher grades are housed in special facilities].").  The FDOC examiner also recommended that Plaintiff participate in a vocational training program, and he assessed a GAF score of 75, which score—or any score between 71 and 80—indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stresses, with no more than a slight impairment in social, occupational, or school functioning (tr. 311; *see also* DSM-IV at 32).

        Thus, as can be seen, the FDOC examiner reached his conclusions only after conducting an extensive mental status examination, conducting a clinical interview, and administering the BETA test, all of which factored into his overall opinions as to Plaintiff's mental status, psychiatric grade, and intellectal level, and which bolster the reliability of those opinions.  What is more, the examiner's conclusion as to Plaintiff's IQ score has indicia of reliability that other IQ scores of record lack.  For example, the FDOC examination did not occur in connection with Plaintiff's claim for SSI or while she had a claim for benefits pending.  Thus, Plaintiff had no motive to portray herself as more limited than she actually was.  Likewise, the examiner had no motive to find Plaintiff less limited than she actually was, intellectually or otherwise.  To be sure, the primary purpose of his examination was to determine whether Plaintiff needed such things as mental health treatment, mental health counseling, additional intelligence testing, medication, special housing, or transitional services during her incarceration.  All of these things were available within the FDOC, and the examiner had no apparent reason to decline to recommend them if he believed they were warranted or necessary.  Similarly, he

---

        [15] Inmates who are found to be suffering from a developmental disability or serious mental disorder are immediately referred for outpatient, infirmary, transitional, or crisis stabilization care  (*see* attached instruction). Here, the examiner specifically found that Plaintiff did not need not transitional or crisis care because she was not mentally retarded and had no moderate impairment (tr. 311).

had no reason to refer Plaintiff for vocational training if he did not believe she was an appropriate candidate for it or otherwise did not have the mental (or physical) capacity to participate in such training.  Finally, Plaintiff, as an inmate, should have had no access to drugs or alcohol at the time of the September 2008 FDOC evaluation, or for months prior to it,[16] and thus her faculties likely were not impaired during the evaluation.  This is not to say that Plaintiff's faculties were necessarily impaired during other evaluations, but given her history of marijuana use, history of alcohol abuse, long history of crack cocaine abuse, and her admission to Dr. Salinas that she had smoked crack cocaine a mere three weeks before he evaluated her, this is merely to point out that Plaintiff in all likelihood was not using intoxicating substances at, or within months of, the time of the FDOC evaluation, though she could have at or near the times of other evaluations (which could have affected her performance during those evaluations, a point noted by the ALJ (*see* tr. 26–27)).  All of these factors support a finding that the FDOC-administered BETA test resulted in a reliable and valid IQ score of 76, and thus that the ALJ did not err in so concluding.

However, even if the ALJ erred in characterizing the FDOC-assessed IQ score as "valid," the error is harmless.  The regulations require a valid IQ score to support a finding, at step three of the sequential evaluation, that a claimant meets or equals the criteria of Listing 12.05(B) or (C).  The regulations do not require a valid IQ score to support a finding, at step two, that a claimant has a severe mental impairment.  Rather, at step two, the ALJ must determine whether a claimant has proven that she is suffering from a severe impairment or combination of impairments, that have lasted (or must be expected to last) for a continuous period of at least twelve months, and which significantly limit her mental or physical ability to perform "basic work activities."  *See* 20 C.F.R. §§ 404.1509, 404.1520(c) 404.1521(a).  Basic work activities include physical functions not at issue here, and mental functions such as understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. § 416.921.  At step two, an impairment can be

---

[16] Plaintiff was sentenced in Bay County, Florida, in Case No. 0801445, on July 29, 2008 (tr. 166), and she was in custody at the time of her sentencing and had been in custody for eighty-seven days (*see id.*; *see also* http://baycoclerk.com/, case search (felony) for case number 08001445CFMA).  Thus, Plaintiff likely had no access to drugs or alcohol for nearly five months prior to the FDOC's examination (i.e., from early May 2008 through September 23, 2008, the date of the FDOC examination).

deemed non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984); *see also* Bowen v. Yuckert, 482 U.S. 137, 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into account"). Further, although the claimant carries the burden at step two, the burden is mild. McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) ("Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.").

Here, the ALJ noted that the BETA test result placed Plaintiff in the BIF range.  And based on the BETA test score—which the ALJ considered to be valid—and other relevant evidence of record, the ALJ concluded that Plaintiff's BIF was a severe impairment.  The ALJ did not err in so concluding, regardless of the validity of the underlying IQ score, especially considering that this finding resulted in the ALJ proceeding to further consider Plaintiff's BIF at step three and beyond.

ALJ's Failure to Refer Plaintiff for IQ Testing

The ALJ did not err by failing to refer Plaintiff for intelligence testing, either on her own accord or based on the recommendation of Dr. Salinas.  Initially, it is clear that a "claimant has the burden [at step three] of proving that an impairment meets or equals a listed impairment." Burt v. Barnhart, 151 F. App'x 817, 819 (11th Cir. 2005) (citing Barron v. Sullivan, 924 F.2d 227, 229 (11th Cir. 1991)).  To establish that she "meets" the criteria of a listing, she must have a diagnosis included in the listings and must provide medical reports documenting that the conditions meet the specific criteria of the listings and the duration requirement.  *See* 20 C.F.R. §§ 404.1525(a)–(e).  To establish that she "equals" a listing, the medical findings must be "at least equal in severity and duration to the listed findings." *See id*. § 404.1526(a).  Here, Plaintiff presented no evidence of a diagnosis, medical reports documenting that her condition meets the specific criteria of the listing and the duration requirement, or medical findings that are equal in severity and duration to the listed findings.  Instead, Plaintiff supplied childhood school records and associated IQ scores that were obtained prior to the age of sixteen, which are insufficient to carry her burden at step three.  Plaintiff also supplied

transcripts reflecting generally good or at least average grades she attained in grammar school and high school, as well as school records establishing that she graduated from high school, which also fail to establish the criteria of the listing.  *Cf*. Christner v. Astrue, 498 F.3d 790, 794 (8th Cir. 2007) (remanding for further proceedings and concluding that ALJ erred at step three with respect to Listing 12.05 and noting, in part, the existence of a valid full scale IQ score of 58 and that the claimant, who was in special education while in school, "dropped out of school at a low grade (possibly sixth or eighth grade), . . . does not live independently, and is unable to read or write").  Additionally, as previously noted, the record before the ALJ included the results of the comprehensive FDOC evaluation, as well as multiple reports by Plaintiff that she is able to care for herself and perform a wide array of daily activities.  *See id.*  Based on this evidence, the record as to Plaintiff's IQ was sufficiently developed, and the ALJ did not commit reversible error by failing to request that additional IQ testing occur. *See* Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997) (holding that where the record is complete and adequate to make a decision, no showing of prejudice is made); *see also* Johnson v. Astrue, 627 F.3d 316, 319–20 (8th Cir. 2010) (rejecting claimant's argument that ALJ failed in duty to develop the record by not recontacting state agency examiner and requesting IQ testing, where state agency examiner did not administer an IQ test but estimated claimant's IQ score to be at least 80 and indicated he would perform an IQ test if requested to do so, even though record contained a performance IQ score of 69, which was assessed when the 34-year-old claimant was 16 years old); Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003) ("Overall, while it is the ALJ's duty to develop the record . . . the ALJ is under no duty to provide continuing [or other] medical treatment for the claimant.").

Furthermore, although Plaintiff—who was represented by counsel at her hearing—faults the ALJ for failing to refer her for IQ testing, neither she nor her counsel asked the ALJ to do so (*see* tr. at 43–44, 84 (the ALJ confirmed with counsel at the beginning of Plaintiff's hearing that the record, which included the results of Plaintiff's childhood IQ testing, educational records, and FDOC records—as well Dr. Salinas' report, in which he recommended that Plaintiff be referred for a follow-up intellectual assessment—was complete; and the ALJ specifically stated at the end of the hearing that she would review all of the evidence then in the record, as well as the arguments of Plaintiff's counsel, and render a decision within about a month, to which Plaintiff responded "okay")).

If counsel or Plaintiff believed the record required further development, counsel should have alerted the ALJ, but counsel said nothing and did nothing with respect to additional IQ testing until after the ALJ issued an unfavorable decision, at which time counsel arranged for Plaintiff to be evaluated by Dr. Smith.  While it is generally true that the ALJ has an obligation to develop a full and fair record, Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); Lucas v. Sullivan, 918 F.2d 1567, 1573 (11th Cir. 1990); Smith v. Bowen, 792 F.2d 1547, 1551 (11th Cir. 1986); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981), an ALJ is "entitled to assume" that an applicant represented by an attorney is making her "strongest case for benefits."  Glenn v. Sec'y of Health and Human Serv's, 814 F.2d 387, 391 (7th Cir. 1987).  See also Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) ("[i]t is not unreasonable to require the claimant, who is in a better position to provide information about h[er] own medical condition, to do so").  Additionally, "the ALJ must exercise some discretion in deciding when and how [s]he should order additional evidence."  Griffin v. Barnhart, 198 F. App'x 561, 564 (7th Cir. 2006).  And the degree of the ALJ's responsibility to take the initiative is influenced, if not entirely dictated, by the presence or absence of counsel for the claimant.  Nicholson v. Astrue, 341 F. App'x 248, 254 (7th Cir. 2009).  Given that Plaintiff was represented by counsel, and counsel made no request for additional IQ testing, the ALJ's failure to order such testing does not constitute error under the totality of the circumstances of this case.

In conclusion, although additional IQ testing at or near the time of Plaintiff's hearing likely would have been helpful, one way or the other, the question before this court is whether the ALJ's decision to rest on the record that she had was an abuse of discretion.  The court concludes that it was not.

(4)      Evidence Submitted to the Appeals Council ("AC")

Plaintiff contends that Dr. Smith's report supports a finding that she meets the Paragraph B and C criteria of Listing 12.05.  In support, she points to the Full IQ score of 59 assessed by Dr. Smith on January 20, 2012, and other IQ scores he assessed at the same time in the range of 60 through 70, and she argues that the AC erred in denying review in light of Dr. Smith's findings.

The fourth sentence of 42 U.S.C. § 405(g) is applicable here.  It provides federal courts with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause

for a rehearing."   A sentence-four remand may be appropriate when the claimant submits new evidence to the AC which the AC did not adequately consider in denying the claimant's request for review.  Ingram, 496 F.3d at 1261.  With respect to this type of remand, it must be established that, in light of the new evidence submitted to the AC, the ALJ's decision to deny benefits is not supported by substantial evidence in the record as a whole.  *Id*. at 1266–67; *see also* 20 C.F.R. 404.970(b) (the AC must consider new, material, and chronologically relevant evidence and must review the case if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record").  New evidence submitted by a claimant to the AC must relate to the period on or before the date of the ALJ's decision.  *See* Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999); 20 C.F.R. § 404.970(b) (requiring AC to consider new evidence "only where it relates to the period on or before the date of the administrative law judge hearing decision").  A sentence-four remand is unwarranted if there is no "reasonable possibility that [the new evidence] would change the administrative result." Milano v. Bowen, 809 F.2d 763, 766 (11th Cir. 1987).

Dr. Smith's report indicates that his opinions relate to Plaintiff's "current" condition, that is, her condition in mid to late January 2012, or some two months after the time frame relevant to this appeal.  The opinions thus do not directly relate to the relevant period.  While IQ scores tend to stabilize after a person reaches the age of sixteen, and therefore the scores assessed by Dr. Smith arguably shed some light on Plaintiff's condition during the relevant period, there is no reasonable possibility that his report would change the administrative result.

Initially, the IQ scores assessed by Dr. Smith are inconsistent with other evidence of record, including Plaintiff's FDOC records and evidence of her daily activities and vocational abilities. Additionally, Dr. Smith did not review any external evidence or records prior to evaluating and testing Plaintiff.  Instead, to determine Plaintiff's history he relied upon her verbal statements and the written statements she provided on a questionnaire prepared for his use.  With respect to the latter, the questionnaire was not included with Dr. Smith's report or submitted to the AC (*see* tr. 363–67).  Thus, it is not part of the record before this court and, correspondingly, the nature, extent, and veracity of Plaintiff's written statements are unknown, as is the extent to which Dr. Smith relied on the information contained on the questionnaire.  With respect to Plaintiff's verbal statements, the record establishes that Plaintiff was not entirely forthright with Dr. Smith.  For example, although she admitted to

previously using cocaine, she told Dr. Smith—indeed "emphasized" to him—that she had been "clean" for four years (tr. 364). This statement, however, contradicts other reports by Plaintiff, including her testimony in 2011 that she last used crack cocaine in 2010 or 2011, and her statement to Dr. Salinas in May 2010 that she used crack cocaine approximately three weeks before he evaluated her. Additionally, Plaintiff told Dr. Smith she had problems performing certain activities of daily living, such as cooking, due to cognitive and/or memory problems, but she testified at her hearing that she cooked and performed other household chores (and her testimony is largely consistent with her reports to agency workers and/or their observations). It is thus evident that Plaintiff portrayed herself to Dr. Smith in a light most favorable for an award of benefits—namely, that she was clean and sober but still had significant mental functional limitations. And the extent to which Dr. Smith relied on Plaintiff's less-than-forthright statements in forming his ultimate opinions and conclusions is unclear.

In sum, because there is no reasonable possibility that the new evidence from Dr. Smith would change the administrative result, a remand under sentence four is unwarranted. Plaintiff may use Dr. Smith's report in support of another application for benefits if she wishes, but the report does not undermine the decision of the ALJ or the AC with respect to the application at issue in this appeal.

B.      Upper Extremity Limitations

In relevant part, the ALJ included in Plaintiff's RFC a restriction to light work, occasional lifting of up to twenty pounds, occasional performing of gross manipulation with the right hand, and frequent pushing and pulling with the right hand but no limitations with respect to the left upper extremity (*see* tr. 27). Plaintiff contends the RFC finding is inconsistent with the record, including the opinions of Dr. Jacobs and Dr. Garcia, and that the ALJ erred by failing to include in the RFC any restrictions related to the use of her left upper extremity. The court finds no error.

In support of the RFC finding the ALJ considered Plaintiff's testimony and statements, including that she was able to clean (and was cleaning) houses at the time of her administrative hearing and her report on two separate occasions that she is able to lift up to thirty pounds with her left hand (tr. 24). The ALJ also considered that Dr. Jacobs "reported 5 of 5 grip strength in [Plaintiff's] upper extremities bilaterally" (tr. 24). The ALJ acknowledged that Dr. Jacobs found some limits in ROM at the left elbow but nevertheless concluded that these limits did not preclude employment at a "reduced range of light work" (tr. 24). The ALJ again pointed to Plaintiff's own

statements about her abilities, which are consistent with—and, in part, even greater than—the limits of the RFC (*id*.).   The RFC is also consistent with other evidence in the record, including evidence establishing that Plaintiff is able to write and pick up coins with her dominant <u>left</u> hand, reach and grab with both hands (though she has some difficulty doing so with the <u>right</u> hand), button and unbutton shirts with both hands, zipper with both hands, fold clothes with both hands, dial a phone with her <u>left</u> hand, and generally perform a variety of household chores.   Thus, even though Plaintiff is unable to fully flex, pronate, or supinate at the left elbow, the reduced ROM as to these movements does not preclude full use of the left arm for the type of employment identified by the VE.[17]   Additionally, to the extent Plaintiff points to Dr. Jacobs' opinion that Plaintiff's condition will "limit her employment possibilities" (*see* doc. 19), the opinion does not undermine the ALJ's RFC determination or ultimate conclusions.   Dr. Jacobs opined that Plaintiff's employment opportunities will be limited, not precluded, and—consistent with this opinion—the ALJ found Plaintiff capable of performing only a limited type of work.   Further, even if Dr. Jacobs had opined that Plaintiff is precluded from work, the ALJ was under no obligation to credit such an opinion.   *See* 20 C.F.R. § 404.1527(e)(1) (a finding of disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion); 20 C.F.R. § 404.1527(e)(3) (opinions on issues reserved to the Commissioner will not be given "any special significance"); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").

Finally, Plaintiff claims the ALJ erred by failing to include in the RFC, or address, the opinion of Dr. Garcia that Plaintiff is limited, <u>bilaterally</u>, to handling (gross manipulation) and fingering (fine manipulation) for only two-thirds of the day (i.e., "frequent" manipulation) (*see, e.g.*, tr. 356, ¶2)).   The ALJ did not err.   "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in the decision," so long as the ALJ's decision enables a reviewing court to determine whether she considered the claimant's medical condition as a whole.   <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005) (citing <u>Foote</u>, 67 F.3d at 1562 (11th Cir. 1995)).   The ALJ's lengthy and

---

[17] In the middle of her discussion of this claim, in a footnote, Plaintiff contends that the ALJ erred in deeming the left elbow deformity a non-severe impairment (doc. 19 at 18 n.9).  The ALJ did not err.  The evidence establishes that the condition does not significantly limit Plaintiff's physical ability to perform basic work activities.

detailed opinion in this case convinces the court that she indeed considered Plaintiff's medical condition as a whole. Moreover, it is especially clear that the ALJ carefully considered Dr. Garcia's opinions because she did not "blindly adopt" all of them. For instance, the ALJ specifically noted that Dr. Garcia opined that Plaintiff could frequently balance, stoop, kneel, crouch, and climb ramps and stairs, but the ALJ viewed "the evidence in a light most favorable to [Plaintiff]" and limited Plaintiff to only the occasional performance of such activities (tr. 32; *see also* tr. 27, 357). Similarly: (1) Dr. Garcia opined that Plaintiff had no limits with regard to exposure to pulmonary irritants and various other environmental conditions, but—presumably due to Plaintiff's asthma—the ALJ included in the RFC limitations with respect to exposure to fumes, odors, dust, gases, and chemicals; (2) Dr. Garcia opined that Plaintiff had no limits with regard to pushing or pulling, but the ALJ limited Plaintiff to "frequent" pushing or pulling with the right arm; and (3) Dr. Garcia opined that Plaintiff could frequently perform gross manipulation with the right upper extremity, but the ALJ limited Plaintiff to "occasional" right-sided gross manipulation (tr. 32; *see also* tr. 27, 356, 358, 359). Moreover, Dr. Garcia considered many of the same reasons that the ALJ considered in reaching her conclusions. For example, Dr. Garcia explained in the narrative section of her report that she relied on evidence of record showing that Plaintiff can sweep, vacuum, cook, and do dishes and, specifically with respect to the left arm/hand, evidence showing that she can pick up coins, button and unbutton shirts, zipper, and fold clothes (tr. 356). Dr. Garcia ultimately concluded that Plaintiff is capable of performing substantial gainful employment, with the limitations set forth in her report. Although the limitations in her report are not wholly identical to the ones set forth in the RFC, they are nearly identical, and both she and the ALJ found Plaintiff capable of working.

Put simply, the ALJ did not err by failing to incorporate into the RFC the limitation to frequent bilateral handling and fingering assessed by Dr. Garcia—while at the same time incorporating multiple other limitations that were <u>not</u> assessed by Dr. Garcia—because substantial evidence in the record as a whole supports the ALJ's RFC determination.

C.      Credibility Findings

The ALJ found that although Plaintiff has "some level of functional limitations," the limitations are not as significant as alleged by Plaintiff. In support, the ALJ pointed to a variety of factors, including that Plaintiff is able to perform a wide array of daily activities; differing reports of

Plaintiff's abilities exist in the record; Plaintiff can relieve her symptoms with conservative measures such as heat and over-the-counter medications; according to Plaintiff's own reports, she is able to lift thirty pounds with her left hand; Plaintiff was cleaning houses at the time of her hearing; Plaintiff had no medical or mental health treatment during the relevant period; when Plaintiff previously received medical care, no treating source imposed work-related restrictions or limitations; Plaintiff graduated from high school; Plaintiff admitted to being "better" now than when she previously received SSI; and Plaintiff's physical and mental examinations within the FDOC were largely normal, and Plaintiff was cleared for prison work release (tr. 23–34).

Plaintiff contends that ALJ erred with respect to other factors she considered in evaluating her credibility (*see* doc. 19 at 18–22 (discussing the ALJ's findings regarding third-party reports of Plaintiff's abilities, the nature of Plaintiff's high school education ("special" versus "regular"), and Plaintiff's past work history)).  The court need not address these contentions or determine whether the ALJ erred with respect to them because any error that exists is harmless.  The factors cited in the preceding paragraph are well supported by the record and provide more than substantial support for the ALJ's credibility determination.

VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that the decision of the Commissioner is **AFFIRMED**, that this action is **DISMISSED,** and that the clerk is directed to close the file.

At Pensacola, Florida this 29th day of October 2014.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**